$\mathcal{JJ}$

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LYNAS D. TALLEY,                           )
                                           )
            Plaintiff,                     )    Case. No. 07 C 5751
       v.                                  )
                                           )    Magistrate Judge
MICHAEL J. ASTRUE, Commissioner            )    Arlander Keys
of Social Security,                        )
                                           )
            Defendant.                     )

### MEMORANDUM OPINION AND ORDER

### Facts & Procedural History

On April 27, 2005, Lynas Talley filed for Disability

Insurance Benefits ("DIB"), claiming that back injuries left him

unable to work as of March 30, 2003. R. at 67. The Social

Security Administration ("SSA") denied his application on June

10, 2005. R. at 50. Mr. Talley asked the SSA to reconsider,

claiming that he was "completely disabled by [his] impairment."

R. at 48. The SSA rejected his reconsideration request on July

26, 2005. R. at 42.

Following Mr. Talley's timely request for a hearing filed

August 18, 2005, Administrative Law Judge ("ALJ") John K.

Kraybill heard the matter on May 17, 2007. R. at 286-321. On June

12, 2007, the ALJ issued his decision, finding Mr. Talley "not

disabled" and thus ineligible for DIB. R. at 19. On July 2, 2007,

Mr. Talley requested a timely review of the unfavorable decision.

R. at 273-4. On September 14, 2007, the SSA denied Mr. Talley's request for review of the ALJ's decision, making the ALJ's decision the final agency decision. R. at 5-8.

Mr. Talley then filed suit in federal court, the parties consented to proceed before a magistrate judge, and the case was reassigned to this Court. Mr. Talley now asks this Court to enter summary judgment in his favor, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, reversing or remanding the decision of the Commissioner of Social Security to deny his claim for DIB. 42 U.S.C. §405(g)(2006). The Commissioner has filed a cross-motion for summary judgment, asking this Court to affirm the decision below. For the reasons set forth in this opinion, Mr. Talley's Motion is granted, and the case is remanded to the Commissioner for further proceedings.

## A. Proceedings before the ALJ

Mr. Talley appeared with his attorney at the May 17, 2007 hearing before the ALJ. R. at 286. He testified, as did Dr. Sheldon Slodki, the Medical Expert, and James Breen, the Vocational Expert. R. at 286.

### 1. Testimony of Mr. Talley

Mr. Talley testified that he was born on August 17, 1970, making him thirty-six years old on the date of his appearance at the hearing. R. at 12, 18. With regard to his employment history,

2

Mr. Talley testified that, his last employer was Madison Lighting; he terminated employment in March of 2004. R. at 290, 297. He testified that at Madison Lighting, he was a "delivery guy" and stocker for two years. R. at 298. He testified that he was responsible for moving furniture; he would lift up to 200 pounds of furniture at a time, usually with the aid of two other employees. R. at 298. He testified that he lifted approximately 100 pounds on a regular basis. R. at 298-299.

Mr. Talley testified that prior working at Madison Lighting, he was a salesclerk and stocker at Sam's Club. R. at 299. There, he would regularly lift fifty to sixty pounds; he testified that he spent most of his day standing, except during fifteen minute break periods. R. at 299. Mr. Talley testified that he also worked in the deli department at Sam's Club, where he cut meat. R. at 300. He testified that, in the deli, he lifted small meats as well as boxes that weighed thirty to forty pounds. R. at 300.

Mr. Talley testified that, prior to working for Sam's Club, he was employed as an assistant press operator at Print Pack. R. at 301. He testified that, at that job, he was required to lift ink rolls by standing and stooping. R. at 301. In response to questions from the vocational expert, Mr. Talley testified that, at Print Pack, he would lift approximately forty to fifty pound solvents; he worked in that capacity for two years. R. at 317.

Mr. Talley testified that, at one of these previous jobs he suffered a thumb injury and a back injury. R. at 301. He testified that he had been compensated in October of 2005 for his back injury with a Workman's Compensation claim for $56,000. R. at 275, 291. Mr. Talley testified that, since his back surgery in 2004, he has not made any attempt to work. R. at 295.

Concerning his ability to lift objects, Mr. Talley testified that his doctors recommended permanent restrictions as to the amount of weight he could lift or carry if he were to work. R. at 296. According to Mr. Talley, his back surgeon, Dr. Campbell, prohibited him from lifting over fifteen pounds. R. at 295. Mr. Talley testified that, if he were standing, he could not lift a fifteen pound object off of the floor because it would be too painful, but that he would be able to lift a fifteen pound object off of a table. R. at 304. He also testified that, if he were sitting, he would not be able to reach to the floor to pick up a fifteen pound object and place it on top of a table because it would be too painful. R. at 304.

With regard to his daily activities, Mr. Talley testified that, if he were to sit for more than twenty minutes, he would need to transfer his weight from "one booty cheek to the next." R. at 301. He also testified that when he stands, he must "put one leg in front of the other" in order to alleviate his pain. R.

4

at 301. Mr. Talley pointed out that if he were to stand and sit for twenty-five minutes each, he would only be able to do that twice before needing to lie down. R. at 302. He testified that if he were to stand or sit for four or eight hours consecutively, it would "tucker" him out. R. at 302.

He also testified that he is "a lot more stiff" in the morning and experiences continuous back pain. R. at 296-297. He testified that he has "numbness" in his left leg. R. at 297. He also testified that, in the winter, he is more sensitive because he feels the bolts implanted in his back. R. at 297. He testified that if he were asked to bend forward at his waist, he could only reach to the middle of his thighs with the tip of his fingers. R. at 303. According to Mr. Talley, the bolts in his back limit his flexibility because he feels a sharp pain, stretching from his buttock to the middle of his back. R. at 303. He testified that he cannot stand "straight up" because he experiences numbness down the backside of his leg to the bottom of his foot and toes. R. at 303. About fifteen to twenty minutes into the hearing, Mr. Talley asked the Court if he could be allowed to stand up from his seated position because he was very uncomfortable. R. at 301. Concerning his mobility, Mr. Talley testified that he is able to climb up and down stairs very slowly. R. at 304. He testified that he currently lives on the first floor of his house, which

5

requires ascension of three steps. R. at 304. Mr. Talley testified that his old house in Naperville was on the third floor, and that he had to move because the stairs were impossible for him. R. at 305. Mr. Talley testified that his longest stretch of driving in the past six months was thirty-five minutes from Elgin to Downers Grove, Illinois, but even then, he had to stop at a gas station to stretch. R. at 305.

Mr. Talley also testified that he has trouble staying asleep. R. at 294. Although he is able to fall asleep, he testified that he wakes up every two hours. R. at 295. He testified that he discussed his sleeping problems with his doctor, who recommended that he place a pillow between his legs when he sleeps to make him more comfortable. R. at 295.

With regard to controlling his pain, Mr. Talley testified that he recently started using a Transcutaneous Electrical Nerve Simulation unit ("TENS unit") four times a day, for a half an hour each time. R. at 291-292. He also testified that, at the time of the hearing, he was taking the following medications: Methacarbonal, Ibuprofen, Pantoprozole, and Gabapentin (also known as Neurontin), Naproxen, and Acetaminophen. R. at 293. Mr. Talley testified that he suffered no side effects from these medicines. R. at 293.

2.   Testimony of Dr. Sheldon J. Slodki, Medical Expert

After Mr. Talley testified, the ALJ heard from Dr. Sheldon J. Slodki, who testified as the medical expert. R. at 307. Dr. Slodki, a Board Certified internist, testified that there was sufficient objective medical evidence to allow him to provide an opinion of the claimant's medical status. R. at 307. Dr. Slodki testified that he is not an orthopedic surgeon, and that he never examined or treated Mr. Talley. R. at 306-307. He testified that Mr. Talley was suffering from low back pain, spine or back pain with residual radiculopathy after the fusion and GERD. R. at 308. Dr. Slodki testified that these conditions and impairments showed that Mr. Talley had "effective ambulation, 1.0B2" with some restriction. R. at 308. Dr. Slodki testified that Mr. Talley could: lift no more than ten pounds at a time; occasionally lift and carry items such as docket files, ledgers and small tools; and sit with a certain amount of walking and standing as necessary to carry out job duties. R. at 311.

Dr. Slodki testified that Mr. Talley suffers from pain in his back and lower extremities, but that he "does not have difficulty with his upper extremities other than the restriction to lift and carry." R. at 309. Dr. Slodki testified that Mr. Talley's impairments would affect his ability to perform work-related activities, but that they do not meet or equal in

7

severity the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (the "Listings"). R. at 311. He concluded that Mr. Talley could perform sedentary work. R. at 311.

Based upon Mr. Talley's testimony concerning how he was feeling on the day of the hearing, Dr. Slodki testified that, if his symptoms existed, Mr. Talley might not even have the capacity for sedentary work. R. at 312. He also testified that Mr. Talley's testimony suggested that he might be suffering from something called "failed back surgery syndrome," which may be an impairment separate and apart from Mr. Talley's other back issues. R. at 312-3.

At the hearing, Dr. Slodki questioned Mr. Talley's testimony and the record which indicated that Mr. Talley experienced "radiculopathy." R. at 309. Dr. Slodki testified that radiculopathy is a problem affecting nerves and that, if Mr. Talley had such an issue, he would have expected to see a record of an Electromyogram ("EMG") to examine the nerve damage of his lower extremities, yet he did not. R. at 309. Mr. Talley testified that he never had an EMG. R. at 309.

With regard to Mr. Talley's medications, Dr. Slodki testified that he believed Mr. Talley took Protonix to control his upper GI tract, and he questioned the record stating that Mr.

8

Talley was taking Protonix to control his leg numbness. R. at 308. According to Dr. Slodki, Protonix is generally used for gastroesophegeal reflux, which may occur when a patient uses Naproxen, Ibuprofen and Acetaminophen together. R. at 308.

3. Testimony of James Breen, Vocational Expert

Next, the ALJ heard from James Breen, a vocational expert. R. at 318. Mr. Breen described Mr. Talley's vocational profile first by labeling Mr. Talley's past work experiences. R. at 318. Mr. Breen defined Mr. Talley's previous occupation as a forklift operator as semi-skilled and medium in physical demand; as a print press operator, semi-skilled and medium in physical demand; as a furniture mover/driver, semi-skilled and very heavy in physical demand; as a sales clerk, semi-skilled, light and medium in physical demand; as a warehouse worker, unskilled and medium in physical demand; and as a deli slicer, unskilled and light in physical demand. R. at 318.

Mr. Breen testified that an individual with the RFC described by Dr. Slodki could perform sedentary work but could not perform Mr. Talley's previous relevant occupations, as all of them were greater than sedentary. R. at 318. Mr. Breen testified that, in his view, Mr. Talley should be limited to unskilled, sedentary work because none of his skills were transferable. R. at 318.

9

Mr. Breen also testified, however that, based upon Mr. Talley's hearing testimony, his need to lie down periodically throughout the day would rule out any and all unskilled, sedentary work. R. at 318. According to Mr. Breen, if an individual cannot perform an eight hour day or if his medical problem would take him off task longer than ten minutes out of each hour, he would be unable to work in even a sedentary capacity. R. at 319.

B.     Medical History

In addition to the live testimony of Mr. Talley and the two experts, the ALJ considered the medical records on file.

1.     Background and Treatment

Initially, the record shows that, on February 25, 2003, Mr. Talley suffered a contusion and abrasion of the left hand and a sprained left wrist. R. at 174. X-rays reveals no fracture, but a subsequent CT scan of Mr. Talley's left thumb showed an "avulsion fracture at the base of the first distal phalanx." R. at 177.

In addition to Mr. Talley's thumb and hand injuries, the record contains numerous documents supporting Mr. Talley's claim of back problems. R. at 166. The medical evidence shows that Mr. Talley hurt his back and left hip while working as a mover for Madison Lighting. R. at 165. On May 22, 2003, Mr. Talley saw Dr. Weaver, where he explained that he was injured when a love seat

10

fell off the back of his truck while he was holding it. R. at
165. He told the doctor that he "developed an immediate pain in
his lower back and left hip [that has been] hurting him ever
since." R. at 165. According to Dr. Weaver's notes, Mr. Talley
expressed that anti-inflammatory medications did not ease his
pain. R. at 165. The record reveals that Mr. Talley described his
pain as "sharp," but said the pain did not radiate down into his
leg, nor did he feel any "tingling, weakness or numbness of the
extremities." R. at 165. Dr. Weaver concluded that Mr. Talley's
lower back pain was likely caused by pulled muscles. R. at 166.
He prescribed Mr. Talley Panlor DC for his pain and advised him
to use wet heat and topical analgesics and to actively stretch.
R. at 166.

The record shows that Mr. Talley returned to the clinic a
week later, on May 29, 2003, complaining of continued back pain.
R. at 164. At that time, he saw a different doctor, Dr. White,
who noted that Mr. Talley's lateral bending to the right caused
him pain on his left side; Mr. Talley had "negative straight leg
raise in the left" and a "musculoskeletal lumbosacral strain." R.
at 164. The doctor recommended physical therapy and assigned Mr.
Talley light duty at work for the following week. R. at 164.

The record shows that Mr. Talley subsequently underwent six
sessions of physical therapy, beginning June 6, 2003 and ending

11

June 20, 2003. R. at 147-154. At the final session, the physical therapist concluded that Mr. Talley "tolerated [the] treatment session well with no complaints of increased pain with activities." R. at 146-7.

On June 24, 2003, Mr. Talley returned to Dr. White for a check-up and expressed that he continuously felt a "mild twinge" in his mid back region. R. at 163. The doctor noted that Mr. Talley suffered from pain in his "left paraspinous muscles in the thoracic area on full forward flexion" and a "musculoskeletal lumbosacral strain." R. at 163. Dr. White released Mr. Talley to return to full-time work at Madison Lighting. R. at 163.

The record shows that on October 6, 2003, Mr. Talley again saw Dr. Weaver; at that time, he complained of low back pain. R. at 162. Dr. Weaver noted that Mr. Talley's "straight leg raising was negative," but that he had "paraspinal muscle spasm and tenderness in the lumbar spine...with pain over the S1 joint area." R. at 161. Dr. Weaver diagnosed Mr. Talley's low back pain as "musculoskeletal." R. at 162.

The following week, Mr. Talley saw a different doctor, Dr. Hopkins. R. at 160. The record indicates that Mr. Talley complained of low back pain extending "across his low back without radiation." R. at 160. Dr. Hopkins noted that Mr. Talley experienced pain in the "right side of his back with straight leg

12

lifting test on the left," but no pain with "straight leg lifting test on the right." R. at 160. Mr. Talley was given an injection of Decadron and an MRI. R. at 160. The MRI revealed: very small subligamental herniated L5 disc, degenerative disc disease at L4/L5, and low back pain. R. at 158. Dr. Hopkins ordered him restricted to light duty for three weeks. R. at 158.

Per Dr. Hopkins' referral, Mr. Talley met with a different doctor, Dr. Rowland, at Semmes-Murphey on October 21, 2003. R. at 234. The doctor noted that Mr. Talley's MRI showed a "little bulging disc at L4 and L5 with a little soft central bulging," "minimal limitation to bending," "negative straight leg raising," and "no motor reflex or sensory loss." R. at 234. Dr. Rowland suggested that Mr. Talley go to physical therapy three times a week for two weeks. R. at 234. Mr. Talley went to physical therapy for six sessions, but, by the end of the sessions, his physical therapist recommended eight additional therapy sessions. R. at 129-146. He underwent therapy from October 29, 2003 through January 7, 2004. R. at 129-146. At discharge, the therapist reported that Mr. Talley had "significant resolution of painful symptoms" and needed no further therapy sessions. R. at 129. The record shows that approximately three weeks later, on January 29, 2004, Mr. Talley saw Dr. White again; he told the doctor that he was "having back pain that radiate[d] down into his buttocks."

13

R. at 155. He said that he still was required to lift objects and twist his body at work. R. at 155. Dr. White advised Mr. Talley to refrain from lifting anything over five pounds. R. at 155. The doctor noted that Mr. Talley had "equal forward flexion until 30 degrees where his pain begins" and identified Mr. Talley's pain as low back pain and L4 and L5 bulging disk. R. at 155.

A few months later, after continuous low back pain in both buttocks and thighs, Mr. Talley was admitted to a hospital, on April 20, 2004, where he saw Dr. Campbell. R. at 185. Dr. Campbell diagnosed Mr. Talley with "significant L4-5 and L5-S1 degenerative disk disease," which was worse at the L4-5 level with a bulging disk and "filum terminale lipoma," which was very small but elongated. R. at 185. The doctor acknowledged that Mr. Talley failed to improve with nonsurgical treatments, and he suggested surgery. R. at 188.

The record shows that on April 20, 2004, Mr. Talley underwent back surgery for complete laminectomies of L4 and L5, complete bilateral medial facetectomies of L4 and L5, partial bilateral lateral facetectomies of L5 and S1, bilateral foraminotomies L4-5 and L5-S1, complete bilateral diskectomy L4-5 and L5-S1, L4-5 posterior lumbar interbody arthrodesis with Tangent graft, L5 to S1 pedicle screw fusion using 3D TSR instrumentation and morselized posterior lateral bone graft from

14

L4 to S1. R. at 187. He underwent the insertion of six 3D TS pedicle screws, two rods, one crosslink, six setscrews, six connectors and four Tangent bone grafts. R. at 192. At discharge on April 23, 2004, Dr. Campbell, Mr. Talley's surgeon, reported no postoperative complications and opined that Mr. Talley was "fully ambulatory, voiding well on his own," and that his wound was "clean, dry and intact." R. at 182. In addition, Dr. Campbell noted that Mr. Talley's pain was well controlled by medications. R. at 182. At Mr. Talley's discharge, Dr. Campbell restricted him from lifting over ten pounds, from severe bending and stooping and from driving. R. at 183.

With regard to post-operative events, the record shows that a few days after surgery, Mr. Talley informed Dr. Campbell that the area between his big toe and second toe was completely numb. R. at 229. The record indicates that Mr. Talley again met with Dr. Campbell on June 9, 2004. R. at 228. The doctor noted that Mr. Talley's back wound from surgery was healing fairly well. R. at 228. He opined that Mr. Talley was ambulatory independent, generated "five out of five" strength in his lower extremities, and that his lower extremities were "intact and symmetric." R. at 228. Dr. Campbell concluded that Mr. Talley "has done fairly well following surgery." R. at 228.

The record shows that a follow-up lumbar spine x-ray, performed on July 16, 2004, revealed no change in Mr. Talley's back since his last check-up with Dr. Campbell on June 9, 2004. R. at 238. Dr. Campbell examined Mr. Talley, noting that Mr. Talley had "good strength in the lower extremities" and was ambulatory independent. R. at 227. At that visit, Mr. Talley mentioned that he occasionally experienced back pain. R. at 227. Dr. Campbell concluded that Mr. Talley was ready to go back to work as long as he did not lift more than twenty pounds, or stand or walk for more than four hours. R. at 227.

The record shows that on October 18, 2004, Mr. Talley returned to Dr. Campbell for another check-up. R. at 225. At that time, Mr. Talley told Dr. Campbell that sometimes he feels that there is a "catch" in his back. R. at 225. Dr. Campbell noted that Mr. Talley seemed to be doing fairly well, although he experienced some back pain and occasional left leg pain. R. at 225. The record indicates that an x-ray of Mr. Talley's lumbar spine showed "anatomic alignment" and no significant change from his July 16, 2004 appointment. R. at 237. Mr. Talley was still not working as of the date of this doctor appointment. R. at 225.

The record reveals that, after his October 18, 2004 appointment with Dr. Campbell, Mr. Talley's condition worsened. R. at 220. On November 29, 2004, Mr. Talley saw a different

doctor, Dr. Boals, where he complained of back pain and intermittent "leg numbness radiating from his knee to the bottom of his foot," which was not present before surgery. R. at 220. Dr. Boals noted that Mr. Talley showed "flexion of eighteen degrees, extension of ten degrees, right lateral bend of two degrees and left lateral bend of ten degrees." R. at 220. Dr. Boals also determined that Mr. Talley's pain was "residual from injury to the back requiring multilevel fusion with ongoing symptomatology" and concluded that Mr. Talley's impairment was permanent. R. at 221. The doctor opined that Mr. Talley would have increasing difficulty working, would be required to have a sitting job with the ability to change positions often, and would need handicap aids. R. at 221. Dr. Boals concluded that Mr. Talley's employer would have to "tolerate his use of narcotic drugs." R. at 221. The record shows that Dr. Boals suggested that Mr. Talley maintain an ongoing relationship with a pain specialist and avoid "prolonged walking, standing, stooping, squatting, bending, climbing and excessive flexion, and extension or rotation of his back." R. at 221.

The record indicates that almost two months after this appointment with Dr. Boals, Mr. Talley again met with Dr. Campbell on January 19, 2005. R. at 224. At this appointment, Mr. Talley complained of bilateral buttock pain and hip pain. R. at

17

224. He also explained that his pain was mitigated, to a degree, when he sat on one buttock or the other. R. at 224. Dr. Campbell noted that Mr. Talley "has not really done all that well," but that he was "ambulatory independent," "generated five out of five strength in both lower extremities," and had "deep tendon reflexes" that were "diminished but symmetric." R. at 224.

The record shows that, on February 2, 2005, a CT scan of Mr. Talley's lumbar spine was performed. R. at 235. The scan revealed normal alignment of Mr. Talley's lumbar vertebra and no evidence of a herniated disc or significant abnormalities. R. at 235. The scan also illustrated "posterior soft tissue" at the fusion level, which a doctor noted, was probably related to Mr. Talley's fusion. R. at 235.

Additionally, on the same day, Mr. Talley underwent a Functional Capacity Evaluation ("FCE"). R. at 205-216. Senior Assessment Specialist Dox noted that Mr. Talley could, occasionally, sit for four to five hours, in a sixty minute duration; stand for four to five hours, in a forty-five minute duration; walk for four to five hours, for frequent moderate distances; carry, on average, 42.0 pounds; push and pull 46.3 pounds; carry 41.2 pounds from a desk to chair (bilateral); and, lift 36.8 pounds above his shoulders. R. at 209.

The record indicates that, on February 4, 2005, Dr. Campbell

reviewed Mr. Talley's CT scan. R. at 223. Dr. Campbell noted that the CT scan of his lumbar spine showed "good fusion status," and that Mr. Talley's "pedicle screws" and "anterior interbody cages" were in good position. R. at 223. The doctor noted, however, that Mr. Talley was still suffering from back and leg pain. R. at 223. Dr. Campbell also summarized the results of the FCE, noting that Mr. Talley was able to occasionally bend, stoop, squat, crouch and kneel. R. at 223. Dr. Campbell also noted that Mr. Talley's fusion status looked good, but that he "failed to have significant postoperative improvement"; Dr. Campbell referred Mr. Talley to a pain management doctor. R. at 222.

The record shows that Mr. Talley saw Dr. Candido, a pain management doctor, on June 3, 2005, where Mr. Talley underwent a physical examination and an epidural injection. R. at 241. Mr. Talley was referred to Dr. Candido for numbness and failed back surgery syndrome "related to symptoms of the left lower extremity." R. at 241. Mr. Talley complained of "persistent leg pain" and "numbness in left lower extremity" radiating "down from his buttock through the lateral and anterior aspect of the left thigh through the popliteal fossa and into the left gastrocnemius muscle." R. at 241. He mentioned that he had already had three epidural steroid injections, which each provided him with less than three days of relief. R. at 241. Dr. Candido noted that Mr.

Talley had "difficulty walking on his heels and toes secondary to numbness in his left lower extremity" and opined that Mr. Talley's significant limitation in forward flexion at his waist was caused by his stiffness. R. at 242. The doctor noted that Mr. Talley had: rearward extension at the waist which was tolerated to "fifteen degrees but limited by pain"; side-to-side bending, which was tolerated to "fifteen degrees but going towards the left side reproduce[d] left-sided buttock pain"; "diminished sensation to pin prick on the left in the L4, L5 and S1 dermatomes; bilaterally symmetrical "hip flexors and extensors"; and, intact and symmetrical "deep tendon reflexes and peripheral pulses." R. at 242. Dr. Candido concluded that Mr. Talley's left leg numbness was permanent and that nothing could be done to alleviate his pain. R. at 242. He gave Mr. Talley an epidural injection. R. at 243.

The record further indicates that, on October 5, 2005, Mr. Talley saw Dr. Parsioon, a neurosurgeon, complaining of a tingling sensation in his left leg and constant low back pain, which increased when he stood or walked. R. at 258-259. He also complained to the doctor that his back pain had worsened since surgery. R. at 258. Dr. Parsioon noted that, during the appointment, Mr. Talley asked to stand up from his seated position, complaining that when "he sits his pain increases." R.

20

at 259. He also noted that, at times, Mr. Talley would get emotional and cry because of his pain. R. at 259.

With respect to his back and left leg, Dr. Parsioon noted that Mr. Talley experienced: a limited range of motion of his back to five degrees in extension and fifteen degrees in flexion; normal lateral rotations; no drainage, redness or mass present in the lumbar spine; no paraspinal muscle spasms or tenderness; minimal positive bilateral Hoffman sign; straight leg raising test up to ninety degrees was negative bilaterally; and on his left side, back pain at thirty degrees without any leg pain. R. at 259. Dr. Parsioon concluded that Mr. Talley suffered from low back pain; left leg tingling sensation; and status post lumbar fusion. R. at 259.

According to the record, on November 15, 2006, Mr. Talley was admitted to the emergency room for back pain. R. at 261-264. The doctors prescribed him medicine and subsequently released him. R. at 261. The record shows that on December 11, 2006, Mr. Talley was given a Multidisciplinary Outpatient Initial Pain Assessment, where he revealed he was taking Tylenol #3 to relieve his pain. R. at 265. Also, the record shows that, on March 26, 2007, Mr. Talley returned to the hospital for a left facet joint injection L3-4, L5 S1 and a left sacrolliac joint injection. R. at 271.

### 2. Consultants to the Disability Determination Services

On June 7, 2005, Dr. Patey, a medical consultant, completed a physical residual capacity assessment of Mr. Talley. R. at 246-253. Dr. Patey based his conclusions on the medical records and evidence in Mr. Talley's file. R. at 246. According to Dr. Patey's report, Mr. Talley experienced pain with any activity, but could occasionally perform certain physical motions; could drive and climb fifteen stairs at a time; and did "not need to use an assistive device to ambulate." R. at 248, 253. Dr. Patey determined that Mr. Talley could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds; could stand, sit or walk for six hours (with normal breaks) in an eight hour work day; and could push and pull objects. R. at 247. On July 25, 2005, medical consultant Dr. Virgilio Pilapil reviewed Mr. Talley's records and affirmed Dr. Patey's physical residual capacity assessment. R. at 254.

On August 27, 2005, Dr. Marwaha reviewed Mr. Talley's eligibility to work under the disability provisions of the SSA. R. at 255. He completed a review of Mr. Talley's medical history and determined that Mr. Talley had normal ambulation, but could only walk for thirty or forty minutes before needing to stop because of his back pain. R. at 256. Dr. Marwaha also noted that Mr. Talley could sit, stand or stretch at forty-five minute

intervals, but must then assume an alternate position for relief
for fifteen to twenty minutes. R. at 256.

## C.    The ALJ's Decision

On June 12, 2007, in an eight page decision, the ALJ found
Mr. Talley not disabled and not entitled to DIB. R. at 12. The
ALJ articulated his reasoning using the five-step sequential
analysis for determining disability eligibility. R. at 12. At
step one of his analysis, the ALJ concluded that Mr. Talley had
not engaged in substantial gainful activity. At step two, the ALJ
concluded that Mr. Talley had "the severe impairment of
vertebrogenic disorder." R. at 14. At step three, the ALJ found
that Mr. Talley's impairment did not meet or medically equal one
of the listed impairments in Appendix 1, Subpart P, Regulations
No. 4. R. at 14. The ALJ discredited Mr. Talley's account of
daily limitations because, according to the ALJ, his hearing
testimony could not be objectively verified with any reasonable
degree of certainty. R. at 16-17. The ALJ also found Mr. Talley
not credible because his testimony was not supported by strong
medical evidence. R. at 17. At step four, the ALJ determined that
Mr. Talley could not perform his previous work based on a
restrictive residual functional capacity ("RFC"), but could
perform unskilled sedentary work. R. at 17. The ALJ was not
convinced that Mr. Talley's "intense episodes of pain" were so

23

frequent or long lasting that they precluded work at all
exertional levels. R. at 17. Finally, at step five, the ALJ
relied on the vocational expert's testimony in concluding that
Mr. Talley could make a vocational adjustment and perform work
outside his previous fields. R. at 18. The ALJ believed that the
jobs proffered by the vocational expert existed in significant
numbers in the national economy. R. at 18.

## Discussion

### A.   Standard of Review

In reviewing the ALJ's decision, this Court may not decide
facts anew, reweigh the evidence, or substitute its own judgment
for that of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th
Cir. 1994). The Court must affirm the decision of the lower court
provided there is substantial evidence to support the Court's
conclusions. *Id.* Substantial evidence is "more than a mere
scintilla of evidence," rather it is defined as "such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389,
401 (1971)). Where conflicting evidence allows reasonable minds
to differ as to whether a claimant is disabled, the
responsibility for that decision falls on the Commissioner, not
the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990).

The ALJ must provide a minimal level of articulation of his

24

assessment of the evidence and "build an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2002). Where the ALJ's "decision lacks evidentiary support, or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Even though the record may contain substantial evidence to support the ALJ's decision, if the ALJ does not rationally articulate grounds for his decision, the Court must remand. *Id.* at 941.

B.    Social Security Regulations

A claimant qualifies for disability insurance benefits under the *Social Security Act* (the "Act") if all five steps of the sequential analysis are satisfied. *20 C.F.R. § 404.1520 (2007)*. Under the Act, an ALJ must evaluate whether (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the impairment or combination of impairments meets or medically equals any impairment identified in the Listings as being so severe as to preclude gainful activity; (4) the claimant is unable to perform his past relevant work; and (5) the claimant cannot perform other work given the existing supply in the national economy. *20 C.F.R. § 404.1520;*

25

*see Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). A claimant has the burden of proof at steps one through four. *Id.* If this burden is met, the burden then shifts to the Commissioner at step five to determine whether the claimant is able to engage in other work existing in significant numbers in the national economy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

C.    The ALJ's Application of the Five Step Analysis

In an opinion dated June 12, 2007, the ALJ held that Mr. Talley was not disabled during the period in question and was, therefore, not entitled to DIB. R. at 12. The ALJ articulated his reasoning using the five-step sequential analysis for determining disability eligibility. R. at 12.

At step one of his analysis, the ALJ concluded that Mr. Talley had not engaged in substantial gainful activity since the alleged onset date of March 30, 2003. R. at 12. At step two, the ALJ concluded that Mr. Talley had a medically determinable severe impairment – namely, "vertebrogenic disorder." R. at 14. At step three, the ALJ found that this impairment did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. R. at 14. At step four, the ALJ determined that Mr. Talley could not perform his previous work based on a restrictive residual functional capacity ("RFC"), but

could perform unskilled, sedentary work. R. at 17. At step five, the ALJ concluded that a significant range of unskilled, sedentary work was available to Mr. Talley in the national economy. R. at 18. The ALJ concluded that Mr. Talley was not disabled and not entitled to disability benefits. R. at 18.

D. Arguments & Analysis

Mr. Talley argues that the ALJ's decision must be reversed or remanded because the ALJ failed to consider all of Mr. Talley's impairments and failed to explain why Mr. Talley's conditions did not equal a listed impairment; he improperly discredited Mr. Talley's pain allegations; and, in determining Mr. Talley's RFC, he ignored the medical evidence and testimony that favored Mr. Talley. The Court will examine these arguments in turn.

1. The ALJ's Consideration of Mr. Talley's Impairments

Mr. Talley first argues that the ALJ's step two determination was erroneous. He contends that the ALJ should have considered his four impairments separately, which included status post surgical intervention for laminectomies and the implanting of hardware; degenerative disc disease; failed back syndrome; and wrist and thumb injuries. The Commissioner argues that the ALJ considered all of Mr. Talley's impairments in combination throughout his step two determination.

27

At step two, a claimant must prove that he suffers from a physical or mental impairment by providing "medical findings consisting of signs, symptoms and laboratory findings." 20 C.F.R. §416.908 (2007). Although an ALJ is not required to discuss every piece of testimony or evidence, he may not select and discuss only the evidence that favors his conclusion. *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir. 1995); *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985); *Unger v. Barnhart,* 507 F. Supp. 2d 929, 938 (N.D. Ill. 2007) ("[A]n ALJ must discuss, at a minimum level, his analysis of evidence in order to allow the reviewing court to trace his reasoning."). Moreover, SSR 96-3p requires that the ALJ must perform a "careful evaluation of the medical evidence that describe the impairments" in order to make an informed decision about the severity of the claimant's impairment. SSR 96-3p; *see also Diaz,* 55 F.3d at 307 ("Credible and relevant medical evidence may not simply be ignored by the ALJ.").

Mr. Talley argues that the ALJ failed to evaluate his wrist and hand injuries and that his failure is grounds for remand. The Court disagrees. An impairment is considered severe if it lasts for at least twelve months and limits the claimant's ability to perform basic work activities. 20 C.F.R. §416.1521 (1985). The record reveals that Mr. Talley fractured his thumb in February of 2003, but returned to work soon after. R. at 177. At work, he was

28

able to use his hands to perform a range of activities, including lifting a heavy loveseat in May of 2003. R. at 166, 174. There is nothing in the record to suggest that Mr. Talley's thumb and wrist injuries lasted for twelve months or impaired his ability to perform work activities on a long-term basis. Thus, to the extent the ALJ failed to consider Mr. Talley's thumb and wrist injuries in his step two determination, that failure is not grounds for remand. *See Diaz,* 55 F.3d at 307.

Mr. Talley also contends that the ALJ failed to consider three of his impairments: status post surgical intervention for laminectomies and the implanting of hardware; degenerative disc disease; and failed back syndrome. Again, the Court disagrees. The ALJ held that Mr. Talley's injuries fell within the category of "vertebrogenic disorder"; vertebrogenic disorder refers to a category or class of disorders relating to the vertebra or the spinal canal. Mr. Talley's three alleged impairments – status post surgical intervention for laminectomies and the implanting of hardware; degenerative disc disease; and failed back surgery syndrome – would all seem to fall within this definition.

Mr. Talley also argues that the ALJ was wrong to find that he did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in the Listing." R. at 14. In determining whether a claimant suffers

from an impairment that meets or equals a listed impairment, an ALJ must discuss the listing by name and provide more than a perfunctory analysis of the listing to determine if a claimant's condition meets or equals a listed impairment. *See Barnett v. Barnhart,* 381 F.3d 664 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart* 315 F.3d 783, 786 (7th Cir. 2003). As explained above, the ALJ, in discussing vertebrogenic disorders, would seem to have satisfied this standard.[1] Even now, Mr. Talley has failed to explain what listing he thinks the ALJ should have been looking at, or what listing he thinks his impairments would have met or equaled.

## 2. The ALJ's Credibility Determination

Next, Mr. Talley challenges the ALJ's finding that his complaints of leg numbness and back pain were not entirely credible. R. at 17. Mr. Talley argues that, in discrediting him, the ALJ ignored medical evidence that supported his testimony.

Generally, a court will defer to an ALJ's credibility determination because the ALJ had an opportunity to observe the claimant at the hearing. *See Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000); *Ehrhart v. Sec'y of Health & Human Servs.,* 969

---

[1] Because the Court is remanding on other issues, the Commissioner should take note of *Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2006), where the Seventh Circuit suggested that more is required for a valid listing finding.

F.2d 534, 540 (7th Cir. 1992). Unless the ALJ's credibility
assessment is patently wrong, the court will not second guess it.
See Edwards v. Sullivan, 985 F.2d 334, 338 (7th Cir. 1993). On
the other hand, when the ALJ's determination lacks any
explanation or support, however, the court must remand. Elder v.
Astrue, 529 F.3d 408, 414 (7th Cir. 2008); see Armstrong v.
Barnhart, 434 F. Supp. 2d 543, 552 (N.D. Ill. 2006). That is the
case here.

With regard to credibility, the ALJ stated as follows:

Although the claimant has described daily activities
which are fairly limited, two factors weigh against
considering these allegations to be strong evidence in
favor of finding the claimant disabled. First,
allegedly limited daily activities cannot be
objectively verified with any reasonable degree of
certainty. Secondly, even if the claimant's daily
activities are truly as limited as alleged, it is
difficult to attribute that degree of limitation to the
claimant's medical condition, as opposed to other
reasons, in view of the relatively weak medical
evidence and other factors discussed in this section. .
. I am not convinced that the claimant's intense
episodes of pain have been so frequent or long lasting
that they have precluded all work at all exertional
levels at all times material to this decision.

R. at 17. The ALJ's first reason for discounting Mr. Talley's
testimony - the lack of objective verification - is not
appropriate, and his second reason - weak medical evidence - is
not supported by the record.

First, there is no requirement that a claimant corroborate

his daily activities testimony with "objective verification."
And, even if objective verification was required, Mr. Talley's
testimony regarding his daily activities was "verified" by the
medical evidence and the reports of his doctors. For example,
Dr. Campbell reported that Mr. Talley "failed to have significant
postoperative improvement." R. at 222. And Dr. Boals opined that
Mr. Talley would have "increasing difficulty working," would need
a "sitting job with the ability to change positions often," would
"need handicap aids," and would always have to "tolerate his use
of narcotic drugs." R. at 221. Dr. Candido noted that Mr.
Talley's left leg numbness was permanent and that nothing could
be done to alleviate his pain. And Dr. Marwaha noted that, if
Mr. Talley sits or stands for thirty to forty minutes, he must
assume an alternate position for relief for up to twenty minutes
due to his pain. R. at 256.

The ALJ appears to have ignored all of this evidence. Nor
did the ALJ consider the fact that Mr. Tally was admitted into
the emergency room on November 15, 2006, complaining of back and
left leg pain, or that Mr. Talley could not drive for thirty-five
minutes without stopping to stretch. R. at 261-264, 305. This
evidence would seem to support Mr. Talley's testimony concerning
his back pain and the effect it had on his daily activities. Yet
the ALJ did not discuss it. And he should have. *See Zurawski,*

245 F.3d at 888 ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.").

Where medical signs and findings reasonably support a claimant's complaints of pain, the ALJ cannot merely ignore the claimant's allegations. *Zurawski v. Halter,* 245 F.3d 881, 887-888 (7th Cir. 2001); *Cuevas,* 2004 U.S. Dist. LEXIS 13238, at *39. Although an ALJ need not discuss every piece of evidence in the record, he cannot ignore an entire line of evidence that is contrary to the ruling. *Zurawski,* 245 F.3d at 888. A written evaluation of each piece of evidence or testimony is not necessary, but in cases where the claimant offers proof challenging the ALJ's view, the ALJ must articulate, at some minimal level, his analysis of the evidence. *See Orlando v. Heckler,* 776 F.2d 209, 213 (7th Cir. 1985); *Stephens,* 766 F.2d at 290 (7th Cir. 1985) (Flaum, J., concurring). Here, the ALJ failed to satisfy this standard.

This latter discussion would also tend to suggest that the ALJ's second reason for discrediting Mr. Talley - weak evidence - was flawed. The ALJ did not elaborate on why he thought the evidence was weak. Nor did he explain why he doubted Mr. Talley's testimony. The ALJ found that Mr. Talley's claims of

pain were not so "frequent or long lasting that they precluded all work at exertional levels," but he never really explained how he arrived at that conclusion. Mr. Talley testified that his pain makes it difficult for him to sleep; and that if he sits or stands for more than thirty to forty minutes, he must switch positions and, sometimes, nap. R. at 285, 303. Additionally, Mr. Talley testified that he used a Transcutaneous Electrical Nerve Simulation unit ("TENS unit") four times a day, for a half an hour each time, which would seem to demonstrate that his pain was, indeed, quite severe. R. at 291-2. The ALJ never mentioned this evidence in his credibility determination, and he should have. See *Cuevas,* 2004 U.S. Dist. LEXIS 13238, at *38; see *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (holding that "when a claimant's allegations of pain are supported by medical signs and findings, an ALJ must consider them and cannot discount them without articulating specific reasons for doing so."); *Sayles v. Barnhart,* 2001 U.S. Dist. LEXIS 20398, at *9 (N.D. Ill. December 7, 2001) ("ALJ may not ignore evidence that is contrary to her ultimate conclusion; her decision must be based on all the evidence.").

Because the ALJ appears to have ignored favorable medical evidence in determining that Mr. Talley lacked credibility, and because his credibility findings were not otherwise adequately

34

explained, remand is appropriate. *See Elder,* 529 F.3d at 414 (recognizing that where an ALJ's determination lacks sufficient explanation or support, a court can declare it to be "patently wrong" and deserving of a reversal); *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003).

### 3. The ALJ's Residual Functional Capacity Assessment

In his decision, the ALJ concluded that Mr. Talley had the "residual functional capacity to perform the full range of sedentary unskilled work." R. at 14, 18. Mr. Talley argues that this conclusion was erroneous because it relied on flawed testimony from the medical expert and ignored key physician opinions. The Commissioner responds that the opinions of these treating doctors (who the ALJ omitted from his analysis) were all consistent with the ALJ's RFC determination.

The Court agrees with Mr. Talley on this issue, for several reasons. First, in making his RFC determination, the ALJ appears to have relied only on opinions and testimony that favored his final decision, while ignoring the evidence and testimony that favored Mr. Talley. This was improper. *See Lewis,* 518 F. Supp. 2d at 1041 (holding an "ALJ cannot simply dismiss the medical evidence which support Claimant's allegations based upon his own assessment of Claimant's credibility."); *Zurawski,* 245 F.3d at 888; *Henderson v. Apfel,* 179 F.3d 507, 514 (7th Cir. 1999) ("an

ALJ may not ignore an entire line of evidence that runs contrary to her findings" rather she must articulate at some minimal level her analysis of the evidence to permit an informed review."); *Diaz*, 55 F.3d at 307; *Herron*, 19 F.3d at 333.

Mr. Talley's hearing testimony and his doctors' reports support his claim that he was more limited than the ALJ recognized. Dr. Campbell, Mr. Talley's treating physician, who performed his back surgery, suggested that Mr. Talley see a chronic pain specialist; he opined that Mr. Talley had not significantly improved since his back surgery, yet the ALJ ignored this fact. R. at 222. Dr. Candido, Mr. Talley's pain management doctor, noted that Mr. Talley's low back pain and left leg numbness was permanent, and that Mr. Talley could not do anything to alleviate his pain. R. at 242. This was not factored into the ALJ's RFC determination. The ALJ also failed to mention Dr. Boals' report that indicated Mr. Talley would have increased difficulty working. R. at 220-1. The record reveals that Mr. Talley's pain was so severe that epidural injections only provided him two and one-half days of relief; a fact which the ALJ overlooked. R. at 241. Moreover, although the ALJ mentioned the medical expert testimony, he attached no significance to part of the expert's testimony which noted that Mr. Talley might not be able to perform sedentary work and that Mr. Talley may have

"failed back surgery syndrome." R. at 312-3. The ALJ also ignored part of the vocational expert's testimony, which revealed that Mr. Talley may not be able to perform any "unskilled, sedentary occupations" if Mr. Talley's pain allegations were valid. R. at 311, 319.

Second, in his RFC determination, the ALJ not only failed to weigh examining doctors' opinions, but also failed to consider most of Mr. Talley's hearing testimony. At the hearing, Mr. Talley testified that he could not sit or stand for more than two to three hours without resting; he also testified that he could barely bend forward from his waist due to severe pain. R. at 303. After sitting for twenty-five minutes during the hearing, Mr. Talley was in such pain that he asked to stand. R. at 301. Yet the ALJ does not appear to have fully considered this evidence.

Third, in addition to ignoring important medical evidence and testimony, the ALJ failed to adequately explain why he declined to give full weight to certain doctor's opinions. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("When an ALJ refuses to give controlling weight to a treating physician's opinion, he must "minimally articulate" his reasons for doing so."); *Elder,* 529 F.3d at 414 ("If the ALJ discounts the physician's opinions…, the Court must allow this decision to stand so long as the ALJ adequately explained his weight

assessments."). The ALJ merely concluded that no doctor could demonstrate Mr. Talley "was disabled or even ha[d] limitations greater than those determined in th[e] decision." R. at 17. This is simply not true. Dr. Campbell, Dr. Candido, and Dr. Boals all said that Mr. Talley had severe lower back and leg pain which may have been disabling.

All of this evidence shows that Mr. Talley's back pain could be severely disabling, which may limit his ability to perform sedentary work; this is important evidence, which should have been factored into the ALJ's RFC determination. See 20 C.F.R. §404.1545(a) (2003); 20 C.F.R. §416.945(a) (2003). Sedentary work is defined as primarily sitting, walking, standing with minimal lifting. See 20 C.F.R. §§404.1567(a), 416.967(a). A claimant is able to perform sedentary work if he can sit for six hours of an eight-hour work day; occasionally lift objects not great than ten pounds and occasionally walk or stand for up to two hours of an eight-hour work day. See 20 C.F.R. §404.1567(a); Diaz, 55 F.3d at 305; Edwards, 985 F.2d at 339.

Mr. Talley's hearing testimony and medical records show that he may not be able to endure a sedentary work day because he would need to rest every two to three hours and would often need to change postural positions. Unskilled sedentary work involves being able to sit for six hours; Mr. Talley would likely be

unable to do this because if he were to sit for thirty minutes, he would then need to stand for the same amount of time. In determining what a claimant can do despite his limitations, the ALJ must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. *Diaz,* 55 F.3d at 307; 20 C.F.R. § 404.1527(d)(2)(2006) ("a treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence."); *Herron,* 19 F.3d at 333 (an "ALJ may not select and discuss only that evidence that favors his ultimate conclusion."). Here, it was improper for the ALJ not to consider all relevant medical and non-medical evidence in his RFC determination.

The Court finds that the ALJ erred by dismissing out of hand the doctors' opinions and Mr. Talley's claims of pain without any adequate discussion as to why he was rejecting them. In light of the medical evidence, the medical and vocational expert's testimony and Mr. Talley's own unrebutted testimony, the ALJ's RFC determination of sedentary work was not supported by substantial evidence; remand is appropriate.

## Conclusion

For the reasons set forth above, the Court finds that the ALJ's credibility determination and RFC determination are inadequate, and that remand is, therefore appropriate. Accordingly, the Court grants Mr. Talley's Motion for Summary Judgment and denies the Commissioner's Motion for Summary Judgment. This matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated: August 6, 2008

ENTER:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge